The next case is Walker v. Seneca. May it please the court, Mavis Shoket for appellant Carlton Walker. With this court's permission, I'd like to reserve two minutes for rebuttal. Mr. Walker has presented a textbook case of retaliation. Officer Seneca found Mr. Walker hearing his draft civil rights complaint alleging deplorable prison conditions. Seconds after reading it, Seneca unleashed a course of retaliation against Mr. Walker, including by ripping up his complaint and threatening to murder him, all while explicitly stating his retaliatory intent to silence Mr. Walker. If that's not retaliation, then nothing is. The district court made two that we asked this court to reverse. First, as to Seneca, the district court erred at both the motion to dismiss and the motion for summary judgment by finding not a single basis for adverse action in this entire course of retaliation that would chill an ordinary prisoner. But Seneca's abuse included multiple acts of misconduct that could independently satisfy the adverse action element. And second, as to Benwear, the district court erred at the motion to dismiss stage by finding that it wasn't plausible Benwear's adverse actions were motivated by Mr. Walker's protected speech. In fact, Mr. Walker's allegations create multiple grounds to infer causation at the pleading stage. Could you elaborate on that? I mean, what's the connection in the complaint between Officer Benwear's actions and your client's protected activity? The complaint doesn't, it's not even clear that he knew about that protected activity. Your Honor, so to address your second point, knowing that he was aware of the protected activity is actually not a requirement. So this court in Gunn v. Beschler and other cases has said that that is not required to be alleged explicitly. So what are the facts in the complaint that make it plausible that he was engaging in retaliatory conduct? Your Honor, so there's two reasons as to both the firing and the fabricated failure to mop report that allow us to infer causation at the motion to dismiss stage. So first, as the firing, we have the timeline and so that's temporal proximity. We have a timeline of temporal proximity of only eight days to the protected activity and also this temporal proximity to the cluster of retaliatory actions that were occurring. And then second, if we looked under the hood of the firing, you know, first of all, Your Honor, the reasoning for the firing was a sham. The reason asserted... It's a sham, but didn't Walker challenge the firing and he actually got judicial review of the action, right? No, Your Honor, that challenge was as to the fabricated failure to mop report. As to the... Wasn't that the basis of the... No, Your Honor, those are separate. They weren't... There's no... There wasn't relationship between the two. So you're not relying on the failure to mop report as part of the adverse actions by Ben O'Hearn? No, Your Honor, the failure to mop report and the firing both constitute adverse actions and we can rely on both of them. Okay, so why can you rely on the first one if you got judicial review and we have the state court saying that it was justified and that he actually did commit the infraction? Your Honor, that's because the Article 78 proceeding itself doesn't change the fact that there's a genuine factual dispute as to whether Ben O'Hearn fabricated the report. So that opinion, the state court decision actually says that explicitly. At page 1360, it said that petitioners claimed that the misbehavior reports were fabricated, presented a credibility issue for the hearing officer to resolve. So jury has to decide whose evidence to credit and so... Wasn't he found guilty of the infraction? Well, no, Your Honor, not exactly. Not exactly. Right, so at the... At the... The decision also says, and I'll quote, that the misbehavior reports together with the testimony of the corrections officer who authored them, it provides substantial evidence supporting the determination of guilt. And that's also, Your Honor, at page 1360. So again, the only thing the court was saying is that the defendants presented evidence supporting their version of the facts, which again only confirms that this is an issue for a jury. And so here's the... Going back to... Going back to the firing, you know, the reason provided is that you asked me... You asked me to make copies. That was the only reason provided. And so when you look at how close this... Why does the prison have to provide explanations to inmates, or to me for that matter, as to why they're gonna assign somebody to mop the floor or work in a library? I mean, it sounds like... Like you're gonna have the inmates running the penitentiary. No, Your Honor, that concern is not implicated here. And the reason that we're delving into the reason and kind of looking under the hood is that it allows us to... It allows us to infer causation. It allows us to infer, was this retaliatory or not? Not that a certain, you know... Right, your argument is that the prison doesn't normally have to provide reasons, but they can't fire him for an impermissible reason. And you're saying that the circumstances here create an inference that it was done at a retaliation. That's... That's right, Your Honor. And so that's why we look at the reasons. Whereas, nor... If it was just challenging the firing, that would not be something we would consider, because you don't just get to do that independently. But if you could allege that there's an impermissible reason for the firing, then we do look at what the explanation was. That's correct. And what would the remedy be for an impermissible removal from the library? Well, Your Honor, the remedy isn't, you know, at question here. I think that the... The point that we're trying to make when we look under the hood of the firing is to ask, you know, is there a reasonable inference of retaliatory motive? And so that's the heart of the inquiry on causation. And all this court has to determine at the motion-to-dismiss stage is, did Mr. Walker allege enough to create a reasonable inference of retaliatory motive on Benware's behalf? And the answer is yes, firstly in part of... Firstly in part because of the firing. And the... The second, when we look back to, as Your Honors raised, the issue of this fabricated failure-to-mop report, so we have the same arguments as to temporal proximity, which, you know, as a temporal proximity both to Protected Act and to this... I think I understand that. Can I ask about the threats? I mean, don't we normally say that... That making threats that, you know, where there's no follow-through, don't really count as an adverse action because, I guess, prison life is rough and you can manufacture claims of retaliation. And so normally it's only plausible if there's a threat and then some kind of follow-up by the threatening officer. Yes, Your Honor. This court's case law does say that, you know, a single... A single threat in isolation might not rise to the level of an adverse action, but that's not what we have in this case. In this case, we have a threat to murder Mr. Walker or throw him into the box, and then we have an entire sequence of events, entire sequence of misconduct that the district court ignored, which actually proves... You said entire sequence. I mean, I think probably the most compelling thing is he makes that threat that he's going to kill him or throw him into the box and it's the next day, right? That officers beat him up in the bathroom, is that right? Yes, that's correct. And you're alleged that those officers say, you know, this is because of complaints against Officer Senecal. That's correct. So when those officers were beating him, they actually asked Mr. Walker explicitly, do you see how easily you can get killed for filing grievances against Officer Senecal? But that's not all. That's not the entire... That's not the entire universe of retaliation that occurs after the threat. I'm actually kind of focused on that. So we have that. I guess Senecal says, well, they were just freelancing. I wasn't involved in that attack. So why isn't that an argument against being in favor of the district court saying that those are disconnected incidents? Because at the motion for summary judgment, we require to take all the evidence in Mr. Walker's favor. So the posture at summary judgment doesn't allow us to just, you know, disagree on that point specifically. But also, as Your Honor mentioned, it's not... These aren't random acts of violence that are kind of, you know, erupting. The officers not only mentioned Senecal's name, but they've repeated his exact threat. And that really allows us to... So there's a plausible inference that it was coordinated with Senecal. Is the tearing up of the 18 pages an act of retaliation? Yes, of course, Your Honor. And so ripping up the... I don't know why you don't start with that. There's so much here, it's hard to figure out where to start. Because this case... You're starting with the mopping, but it seems to me... Oh, no. So as to... I apologize, Your Honor. As to the... That was the... That discussion goes as to Officer Benware's posture at the motion to dismiss. But we now move down to Walker. Yes. I mean to Senecal, excuse me. Yes. And we're starting now with the ripping up of the pages and the threats. Yes. And so, you know, as Your Honor mentioned, to read the complaint and to see it alleging, you know, these deplorable civil rights violations, presumably with also Officer Senecal's name on it, and just rip... To aggression, an act of contempt, that is enough to chill a prisoner. So the district court thought that Walker did end up filing the amended complaint, is that right? I'm sorry, that he did. That he did. So I guess he had already filed a complaint, right? Yes. And so this was a proposed amended complaint. Did he end up filing the amended complaint? That's right, Your Honor. And this... I'll just walk you through this because there was... That's right, he did file it? He did. And this was a second amended complaint and it was filed... So what is the importance of the idea that it was a year later? Well, just that destroying Mr. Walker's complaint, this ripping apart of 18 pages, it just shows it's not that he, you know, refiled that complaint two days later, for example, right? It took a lot of time and effort. Oh, I understand. I mean, the test is whether a person of ordinary firmness would be deterred. I mean, maybe Mr. Walker is a person of extraordinary firmness. I don't know. I'm not saying it's dispositive whether he filed it or not, but it's just the district court thought he did file it and I just wasn't sure. So I wanted to confirm that. So, but you're saying that he might have been intimidated for some period of time, but eventually got around to refiling it. That's right, Your Honor. But why isn't it that when somebody, you know, we say things that would cause a delay in asserting your rights or so on are not sufficient to say it's an adverse action. It has to be that it would prevent you from asserting your rights. So if somebody has a draft complaint and the officer tears it up, why wouldn't we understand that it's just sort of causing a delay because then you have to draft it again and file it again? Your Honor, that's because if we look to the very simple question that needs to be asked to address adverse action, it's just would this misconduct deter an ordinary prisoner from exercising his constitutional rights? It's not asking, you know, what is the level of convenience that the plaintiff was caused or, you know, how long did it take them to refile? Those questions are not central to the inquiry of the question that we asked this court to answer here, which is that Mr. Walker has alleged an onslaught course of retaliation and that all of these acts of misconduct, certainly the two that the district court judges considered at summary judgment, all of these, both of these actions definitely show that a reasonable prisoner would be deterred from exercising his rights. I mean, I get the physical of ordinary firmness to not assert their constitutional rights. Well, because, Your Honor, the answer to that is that it wasn't just ripping up a complaint and it wasn't just an assault. We have that Senecal ripped up Mr. Walker's complaint. We have the next day that officer... Oh, so you're saying that it should be understood as a course of conduct? That's correct. But in isolation, would ripping up the complaint be sufficient? Well, that's not... Yes, Your Honor, but that's not actually... No, why? Because the question is would it deter a reasonable person from exercising their constitutional rights? And that is a thing. It's an act of aggression. It is something that if you have a prison officer and you have this power dynamic of someone who has power and control over you, it's not just here. It's not just ripping up the complaint. It was this threat that also, you know, came with it immediately. And also, if you file... I would say that these threats aren't enough unless there's some kind of follow-up, maybe like a physical assault. So I acknowledge that. So the question is maybe is ripping up papers more like a threat without, you know, an actual follow-up or is it more like an actual assault? I mean, you're ripping up papers. You're not assaulting the person. So I don't know. Why should we understand ripping up papers to be, you know, the kind of intimidation you would achieve by assaulting a prisoner? Why isn't that just like kind of a threat, just to rip up papers that can be typed up again? Because it's something that would chill speech. And it is literally just destroying the work that you've done in order to assert your rights. And so ripping up a complaint, it's not just literal. It's also this symbolic, emblematic, you know, type of act of aggression that says, I'm an officer and I'm in control of you. I can make your life miserable. And here's what I'm going to do. Here's what I'm going to do about you complaining. And so it was intended to silence him. That's also, you know, central to the inquiry. But that's also intended to silence somebody, but we've said it doesn't amount to an adverse action unless there's the follow-up. So you're saying ripping the papers is a follow-up because it inhibits the actual future action. Even though it only does it temporarily, you're saying that's enough to amount to an adverse action. That's true in a hypothetical universe. But also you don't have to decide that in Mr. Walker's case. Because the question is just do all of these actions together, you know, rise to a level of misconduct that would deter an ordinary prisoner. So that's not a question that... And the most obvious example of that kind of conduct is the physical assaults. Yeah, the physical assaults and also the murder threat. That's a pretty severe... Well, the murder threat in conjunction with the follow-up. Correct. If there were a threat with no follow-up, wouldn't that be the kind of empty threat we've said doesn't amount to an adverse action? No, not at all, Your Honor. The murder threat is certainly not an empty threat. And there's precedent from this circuit that describes a threat that is of lesser severity, and that's in Ford v. Palmer, where a prison officer threatened to put water in a plaintiff substance for complaining. And this court interpreted that statement as being a threat to poison the plaintiff in order to file grievances. But this court said that was enough. So weirdly specific that you kind of would expect a follow-up, whereas just kind of, I'm going to kill you, seems more like the kind of empty threat. No, I think that putting it... Saying that you're going to put something in your water, that seems to me like a little bit more vague. But here saying, if you... And we have to take the full statement right in context. And the full statement that Senecal made was that, if you ever put my name on these grievances, you will end up dead or in the box. And so that is the full threat. It wasn't just, I'm going to kill you. You will end up dead or in the box. And so what we have here is a declaration that Officer Senecal is stating his retaliatory intent to silence Mr. Walker. If he doesn't listen to Officer Senecal, he's going to be murdered or thrown into solitary confinement, which is also really... It's a very much feared situation for a prisoner. So it's something that's particularly horrifying. And so... So you're arguing that the threat combined with the ripping up of the pages, the claims that went forward to summary judgment, would be enough even without the subsequent assault? Yes, Your Honor. And that comfortably clears the bar that this court has set both in Ford versus Palmer on the threat, and also in much of this court's case law regarding things like tampering with a plaintiff's pro se papers in ongoing litigation. That's also Morello and Graham. I mean, is this necessary to your argument? I mean, let's say we think that there's a plausible allegation that the physical assault was tied to the threat. We wouldn't have to decide whether in the abstract the threat standing alone was enough of an evidence. That's right. And Your Honors, do not have to decide any of these actions standing alone. The inquiry just requires us to look at all the acts and say, would this deter an ordinary prisoner? That's all. It's a very simple question that this court's precedent allows us to comfortably reach the conclusion. Are you arguing that tearing up the pleading would discourage an ordinary inmate from asserting his rights because it's so easy to tear up the pleading that it's futile to prepare another one? To prepare another one, you can tear that one up as well. So maybe you're better off lumping it and not complaining at all. That's one, that's certainly one reason that makes this course, all these acts of retaliation, you know, something that would deter an ordinary prisoner. But that's not the only thing we have, Your Honor. So in this case, we have all of these things. So our argument is not, we're not making a standalone independent argument on the- You're arguing a court action. Yeah, so we aren't, and we don't ask this court to, you know, make any specific ruling. And there's no reason for that based on the facts of this case to narrow, to make ruling so narrowly. So the whole thing is part of an ongoing course of conduct. So I was going to ask a little bit about the frisks and so on, which occur like months after the interaction about the complaint. And so I was wondering about whether there really is causation. But your argument is you shouldn't take them alone. It's just part of like a campaign of intimidation that you think started after the incident with the complaint. That's right. And this, the reason for analyzing it that way is that that's how this court has said we must look to adverse action also, like in Hayes and a number of other cases. And also in this court's precedent, discussing temporal proximity, what's really important here is that this court has preserved its latitude to look at each case in the context in which it arises, as far as timing goes. So in Espinal, this court also said that six months passing between protected activity and adverse action is enough to satisfy that. And that's because of the reasonable inferences, right? So Espinal, in Espinal, this court said it's reasonable to infer, it's reasonable to believe that an officer would wait not only for an opportune moment, but for an opportune method to exact retaliation against someone. And if you're a prison guard, then trying to continuously intimidate and harass someone through pat frisks is a great way to silence someone. Yeah, but you guys said that there has to be really strong allegations of a connection, right? I mean, like frisks, for example, are just an ordinary part of prison life. Like in order to say that that amounts to an adverse action, there has to be a very strong inference, both that it was extraordinary compared to the normal kind of a frisk that you would suffer, and also that there was a close connection to the retaliatory motive, right? We wouldn't otherwise say like there's a problem with frisking a prisoner in jail, right? Right, so your honor, that was just one example, and I'm not saying that is the only basis. But to your honor's point about just a pat frisk, I would also point this court to your recent opinion in August of Hundley, where this court basically also said that we have to consider, and the jury should be presented with the entire course of itself, would rise to the level of adverse action or wouldn't, or which combination or permutation of acts of misconduct would arise. And in Hundley... Well, that begs the question, if in fact our cases say there's some acts that just don't rise to the level of adverse action, it's not for the jury to decide. Like if we thought it was a normal pat frisk, we wouldn't like put it to the jury as to whether, you know, there was some impermissible motive or it was bad, right? Yes, your honor, but the reason I raised Hundley was just to say that this court said in Hundley that the pat frisk could be retaliatory and that we could find that that satisfied adverse action. So that was why I mentioned Hundley, because they said there is such a thing, of course there could be such a thing as a retaliatory pat frisk. And also on the record in this case, there is evidence that it was retaliatory because Mr. Walker mentions multiple times... I mean, we did emphasize in Hundley that the pat frisk was in the cell, it was in routine pat frisks. That's true. And so the context there, though, it gives us enough information to say that if you have a similar, you know, context where something doesn't seem standard or routine, as Mr. Walker's alleged in his evidence, that these pat frisks weren't standard and routine. It's not standard and routine to have one officer pat frisk you before you're going into the mess hall and find nothing wrong, and then for Officer Senecal to come back and pat frisk him again, which was violently assaulting him. So, and also Mr. Walker's, you know, allegations, which we have to take as true, and we have to take his evidence, we have to view the evidence in the light most favorable to him. They also, he also said that these were not routine pat frisks. I was targeted. And to be pat frisked multiple times in the same circumstance where there was... I get the allegations about targeting and maybe showing that they were multiple times in the same period might allow inference for the motive, but just saying it was rough and akin to an assault, I'm not sure exactly what makes it different from a normal pat frisk. So aren't those conclusory allegations? Like, how do I know that it really is something more than what a normal pat frisk would entail? Right. Well, Your Honor, and again, just to, you know, just to be clear, this is one of many... No, I get that. We've met this issue too. Yes. So Your Honor, as to that, it's not actually correct that the, that Mr. Walker wrote, you know, in his complaint, one line that it was a vicious assault. So we have these, we have like paragraph, we have paragraphs of descriptions. Well, why don't you just tell me, so what is it that, what was it about the frisk that made it like an assault or made it especially rough? There's a, there's descriptions that, you know, that Mr. Walker gives in these, in these paragraphs saying things that like he, you know, he kicked him, that he was pushed against the wall. These kinds of violent actions that aren't a part of a routine pat frisk. And also the statements that, you know, Mr., the statements that Senecal used in telling, after he was pat frisked once, then becoming violent with him and telling him, get ready for a real rough pat frisk. I mean that, you know, Senecal himself is saying that I'm not going to give you a routine pat frisk. I'm going to give you a rough pat frisk. I'm going to beat you. So that is, you know, that really helps us out here. Okay. We'll hear from your adversary. Thank you. May it please the court, Beasley Kiernan for Officer Senecal and Officer Benwick. Your honors, retaliation claims are easily fabricated, especially in the prison context. That's why this court has instructed district courts to examine such claims with skepticism and particular care. And that's exactly what the district court did here. The court carefully examined the claims at the motion to dismiss stage, dismissed the claim against Officer Benwick because there was no plausible inference of causation, but let the claim against Officer Senecal go to discovery, ultimately granted summary judgment because plaintiff had failed to adduce sufficient evidence of adverse action. Well, I mean, district court considers the threat by Senecal in isolation and says, because there isn't follow-up, it's not an adverse action, right? Like, I agree that, you know, based on this principle you're saying about claims of retaliation being easily fabricated, we have said like a threat without any kind of follow-up is not an adverse action. But here we have the threat. I'm going to kill you or put you in the box. And the very next day officers are assaulting him in the bathroom and they say, you know, this is what's going to happen if you file complaints against Senecal. So why isn't the plausible inference there that that was follow-up from the threat the previous day? Well, again, at the motion to dismiss stage, the claim against Officer Senecal did go forward. Well, the claim against Officer Senecal goes forward, which raises just the threat, but not the threat considered in conjunction with the assault the next day. The court did say, to the extent your claim is based on a wide-ranging conspiracy orchestrated by Officer Senecal, who recruited all these other including Ben Ware and officers who were unnamed, that's not plausible. But I'm not saying it's a wide-ranging conspiracy, right? So let's say I'm just thinking about these two incidents. Day one, Senecal says, I'm going to kill you or put you in the box. Day two, a bunch of police officers say, or beat him up in the bathroom and say, this is what happens if you file complaints against Senecal. So why is it plausible? It's not a wide-ranging conspiracy. It's a 24-hour conspiracy. Why is it implausible that Senecal and those officers were connected, that there was a threat and then a follow-up on the threat? At the summary judgment stage, Your Honor, there's just no evidence that those officers were acting on behalf of Officer Senecal. The district court didn't take additional evidence on whether the officers were acting on behalf of him, right? Because what proceeds to summary judgment is the threat, but not in connection with the assault the next day. Well, Your Honor, nothing prevented a plaintiff from, for example, seeking leave to amend his complaint with additional allegations. And nothing prevented plaintiff from... But why is it implausible, you know, as the motion to dismiss stage, that if you allege that the officers who beat him up said, this is what happens when you file complaints against Senecal, and they even use the threat that repeats what Senecal said about kill you or end up in the box. Why isn't the plausible inference that those are connected? Your Honor, and it may be plausible to infer some sort of connection, but the claim against Senecal did go forward, and plaintiff had the opportunity in discovery to adduce evidence on that. He did, in fact, during his deposition testimony... So you're saying when it went to summary judgment and the district court is still considering the threat, Walker was free to argue that it wasn't simply an empty threat, that it entailed the follow-up the next day? I think that's right, Your Honor. A plaintiff had a retaliation claim against Officer Senecal. He was free to pursue whatever kind of theory he wanted. If this had gone to trial, he certainly could have adduced evidence. So then if the evidence we have before us is that he made the threat, and he was assaulted the next day, and the officers invoked the threat from the previous day, invoked Senecal by name, why isn't there a question of material fact as to whether the two things were related, and that was an adverse action that was follow-up on the threat? If you had that evidence, I think that would suffice, but you don't have that evidence here. So you're saying the district court believed that the officers did not make that threat when they assaulted him in the bathroom? No, Your Honor, there just wasn't any evidence at the summary judgment stage that these other officers had mentioned. Even to the assault? As to the assault. And if plaintiff had testified during his deposition, I don't think he did. But even if he did say these other officers said X, Y, Z, that would not be admissible against Officer Senecal. If these officers were named as defendants in the complaint, then I think a claim would have gone forward at the motion-to-dismiss stage, and the evidence could have been developed. But you can allege a claim against Senecal if you think that Senecal was involved with those officers, right? They don't have to be defendants, do they? No, and plaintiff was free to adduce whatever evidence he wanted to from Officer Senecal, because the claim did proceed to discovery. It's just that plaintiff did not do sufficient evidence based on the threats, based on the orchestration of a threat in particular. What I want to emphasize is that it was not clearly established, and it still is not clearly established, what level of threat is really necessary to constitute adverse action. On the one hand, the court has said threats accompanied by some action, that can be adverse action. But insulting or disrespectful comments, vague threats, that's not enough. I think this court should look at the Supreme Court's recent case law and countermeasure on the true threats context. The court distinguishes between serious expressions conveying that a speaker means to commit violence, and statements which in context do not convey a real possibility of violence. Here the threat was not direct, it was not specific, and it was not credible in context. The threat, however, was alleged to have been made at the time that Officer Senecal tore 18 pages out of what appeared to him to be a complaint about himself, correct? I believe plaintiff testified that there were allegations in the complaint he was amending that mentioned the mess hall. These are handwritten, right? I mean, I don't have to use a computer. So to tear up 18 pages would mean those 18 pages would have to be rewritten, and Officer Senecal would be in a position to tear them up again if he rewrote them. So why wouldn't that have the natural effect of discouraging somebody from pursuing his rights? Because it's futile. I'll write it out, and then he can tear it up. In a different case, Your Honor, I think that could certainly be true, and there may also be an access to court's claim here we're just talking about. What's the different case in which it would be true? Well here, under the circumstances, this is a case, a prior federal action that was already subject to dismissal because the plaintiff had failed to pay the filing fee, and the district court had said that. Plaintiff had already filed an amended complaint earlier that month, September 2017. He's entitled to file as many complaints as the court will allow. That's right, and he could have sought leave to file a second amended complaint. He had not done so. Until he prepared it, he couldn't seek leave to file it, because if it wasn't attached, the court wouldn't allow it to be filed. I think the district court correctly held that this would, at most, inconvenience a plaintiff. It would annoy him. It wouldn't create a deterrent effect. It wouldn't deter you from prosecuting your federal action in the first place. Haven't several other circuits held that the confiscation or destruction of legal materials, in particular, is an adverse action? Even looked at in isolation? And that certainly could be true. For example, say if a plaintiff threatened to file a grievance and the correction officer, in retaliation, destroyed all of plaintiff's legal materials, you know, in many other cases. That would certainly be adverse action, and I wouldn't argue otherwise. But here, it's a de minimis action under the circumstances of this case. Just because it's the first 18 pages only? Because the action was already subject to dismissal. He had already filed an amended complaint. He, in fact, filed a second amended complaint sometime later. If it was his initial complaint, and the same thing happened, it would be an adverse action? Your Honor, that might, that would be a stronger inference, I think, yes. Why does it matter if the question is retaliation for First Amendment protected activity? Why does, if you're entitled to file an initial complaint or an amended complaint, why would it matter whether the thing he's ripping up is an initial complaint or an amended complaint? Well, he was not entitled to file what would be a second amended complaint in the prior federal action, both because it was subject to dismissal, because he had not paid the filing fee, and also because he would have been... So whether it's an adverse action by the prison depends on the sort of procedural posture and the conduct of litigation in which the prisoners are involved? Yeah, I think you do need to look at the particular circumstances of the case. I mean, if he's not entitled to file a second amended complaint, the First Amendment probably protects his right to try, right, to ask for leave to do it, right? And so if he intends to do it and the prison's preventing him from doing that, isn't the retaliation for First Amendment protected activity? It sounds more like an access to court's claim, Your Honor, which is not presented here. At least for retaliation, I think it's just not enough to cross that line. It's annoying, it's inconvenient, but it wouldn't deter an incarcerated individual of ordinary firmness under these circumstances. But that argument you're just making seems to apply either to an initial complaint or an amended complaint, but you said it would be a completely different case if it was an initial complaint. So like, if it wouldn't deter a person of ordinary firmness, then it shouldn't matter whether it's an initial complaint or an amended complaint because it wouldn't deter anybody from proceeding. But then you're saying, well, it'd be very different if it's an initial complaint. So what's the connection between the initial complaint point and the ordinary firmness point? Because, again, under the particular circumstances of this case, the question is whether this action would have deterred an incarcerated individual of ordinary firmness from pursuing that prior federal action. He had already filed an amended complaint earlier that month. Oh, so you're saying, like, a person of ordinary firmness would understand they had already filed an initial complaint and so wouldn't be deterred in following up because he was already sort of bought into litigation. But if he was making an initial determination as to whether to file a complaint in the first place, a person of ordinary firmness might decide that it wasn't worth it and never file. Is that the idea? That could be, Your Honor. Every case is different. I think under the facts of this case, the prior federal action was already subject to dismissal. If he were to file a second amended complaint, it would have been a nullity. He didn't have to leave to court. And again, it was already submitted. I just don't understand this idea that it's already subject to dismissal. Like, you're saying the adverse action is whether the prison is taking an adverse action against him in retaliation for First Amendment activity. And you're saying the nature of Officer Senecal's action depends entirely on whether a district judge in some litigation has made a decision about whether it's subject to dismissal that Senecal has no idea what's happening in the litigation, right? So how does that transform the nature of his action? Because the question is whether an incarcerated individual of ordinary firmness would be deterred from pursuing the litigation, the protected activity itself. He had already filed the amended complaint. He says he was adding allegations. Okay, so he was bought in or something. So he wouldn't be deterred. I understand the argument. Your Honor, turning to the allegations that the district courts narrowed at the motion to dismiss stage, again, there just wasn't a plausible allegation of a conspiracy orchestrated by Officer Senecal. There were conclusory allegations about rough pat frisks. But it's really just plaintiffs saying, again and again, using boilerplate language, these pat frisks were akin to a vicious assault. They were akin to a vicious assault. Well, I actually asked opposing counsel that question. And she said that, well, actually, the complaint tells us that he kicked and pushed him against the wall. And so there were aspects of the frisk that were different from a normal frisk. So why aren't those enough allegations to establish that it's not conclusory? There are allegations that I think plaintiffs' legs were kicked apart. And I think that's pretty much it. And that alone, I think, is not quite enough to rise to the level of an assault. Certainly, an assault could be adverse action. But a pat frisk where a correction officer kicks your legs apart, I don't think that's quite enough. And merely saying that it's an assault is too conclusory. And in any event, a lot of time had passed between the initial protected activity and these pat frisks, which occurred in March, June 2018, whereas the initial actions occurred September, October 2017. A lot of time had passed. A lot of these actions were by correction officers who were not connected to Officer Senecal. At least at the summary judgment stage, there was no plausible evidence connecting these officers to Officer Senecal's retaliatory animals. And this case is quite different from Hundley and Gunn, for example, where you had pat frisks that were not ordinary pat frisks. In Gunn, it was an alleged sexual assault. And in Hundley, it was not only an unusual pat frisk in that it was in the cell, according to the plaintiff. It was also a pretext for a violent assault, according to the plaintiff. And the plaintiff in that case had testified at trial in detail about what that assault looked like. If I may briefly address the claim against Officer Benware, the district court correctly held that there was just no plausible connection between Officer Senecal and Officer Benware. There's no allegation that Officer Benware knew about plaintiff's prior federal action or his grievance against Officer Senecal. Plaintiff merely speculates that Officer Senecal directed Officer Benware to engage in adverse action against him. There's this one allegation that Benware went to an area where Officer Senecal was hanging out and then came back and at that point disciplined plaintiff. That's not enough. That's purely speculative. It's not enough to establish a connection between the two officers. And in any event, you also have the misbehavior report that was administratively reviewed, upheld in state court. Plaintiff only conclusively asserts that it was fabricated. That's not enough to show that Officer Senecal's retaliatory animus Whether the report was fabricated is not related to whether the firing was justified, because the reason for the firing was not the mopping incident. It was the copying incident. I'm not entirely sure, your honor. Plaintiff just says, you know, I was disciplined. I received a misbehavior report. I was also fired at that time. The complaint doesn't make clear that they were motivated by different reasons. It's also worth noting that plaintiff was really just transferred. He was not fired. This came up in his deposition testimony, page 244 of the appendix. He was transferred from law library porter to block porter. He was not fired from a job. So for that reason as well, the district court correctly dismissed the claim against Officer Benware. Does that mean it's not even an animus action? If you thought it was in retaliation, would the transfer not even amount to an animus action? I think that's right, your honor. Now, that came in at the deposition, so it's not in the complaint, but we do know from plaintiff's own deposition testimony that he was just transferred. Unless there are any further questions, I'll urge the court to affirm the judgment below. Thank you. Thank you, your honor. I just want to make three quick points. First, my friend on the other side said that there was, you know, no evidence that they were working together, but that ignores the bombshell evidence that came out at summary judgment where Officer Benware admitted to retaliating against. You're starting with Benware again, but I'm actually just disrupting your three points. But I want to understand this idea about the connection between the threat and the assault the next day, right? So Mr. Akiranan just said, well, the threat went to summary judgment, so you can introduce evidence on that. And if you wanted to introduce evidence that the follow-up in the bathroom the next day was connected to the threat the previous day, you could have done that, but didn't introduce evidence that that actually was connected to the threat or was coordinated with Senegal. Is that right? No, your honor. The first response to that is that Mr. Walker's complaint is an affidavit for summary judgment purposes, and it constitutes evidence because of this court's opinion in Cologne. So the fact that that was included there, it makes it evidence at summary judgment. And also, we have to remember the context of this case. Mr. Walker is being terrorized in prison for trying to exercise his First Amendment rights. And in the deposition, too, it shows that he wasn't properly informed that the deposition was going to happen. And so to blame Mr. Walker for not having a perfect case as someone who is in circumstances such as ourselves, it really doesn't make sense. And so there is evidence at summary judgment. So the evidence at summary judgment that the assault was connected to the threat the previous day is Walker's affidavit. Yes, your honor. And the deposition testimony around pages 245 and 246, that neighborhood is discussing kind of what happened to Mr. Walker, and it includes why he was so scared. And the assault is part of what gave this deep fear to Mr. Walker about the rest of this threat being carried out. He was assaulted. And then not only that, the threat to place Mr. Walker in restrictive housing was consummated. And so that is another fact that came out at summary judgment. That's a different issue. But so, you know, Mr. Kiernan also pointed out, you know, you could have named these officers who assaulted him as defendants. They participated in retaliation. He didn't do that. So why don't you have them as defendants? Why don't you get, you know, some kind of testimony from them about what their motivations were? Well, the officers may not have been named, but the deposition does include that Mr. Walker, and he says this in the deposition, that he named seven people and included with detail the first names, last names, and their inmate numbers of people who he wanted to, you know, question in terms of the course of retaliation. He just wasn't given an opportunity to do that. And so that is also in the deposition. Maybe all those officers weren't named, but there were just so many, you know, five, six, seven, eight officers. And if Mr. Walker had the chance to, you know, put this information before the court without the, you know, umbrella of being retaliated against, he would have done so. The summary judgment deposition shows us that he's trying. He's trying to give names. And he's saying, this is what I want to do. And this is what I would need to do. He just wasn't able to do it. And so, Your Honor, the next point is, you know, I just wanted to emphasize what Judge Jacobs was mentioning about the complaint itself and, like, the deterrent impact and futility. When you write something out, and here's the other reason is, as you mentioned, Judge Jacobs, when you're writing something out, you can't just go back to your computer and reprint it again. You have to remember, what did I write? You have to remember the law. You have to remember all of the facts, all of these dates. Remember what I wrote on June 29th, 2018, March 23rd. That is an extraordinary burden to place upon someone who's not only in prison, doesn't have access to a computer, but then is also being retaliated against. And you had three points, and that was number two, I think? Yes. And, Your Honor, the third point is that I just wanted to mention that regarding Mr. Walker's 14th Amendment due process claim, we read the district court as barring it for being heck barred, and that's wrong because it doesn't necessarily imply the invalidity of his conviction. It would only give Mr. Walker an opportunity to raise his claim. And so, we asked this court to... I'm sorry, but isn't the relief you're seeking in that claim like a new fair forum for adjudication? So, Your Honor, what would happen is that if this court allows Mr. Walker to raise his claim below, the first thing that would happen is he would raise his claim, and then at most after that, he may or may not be granted a new hearing. And so, that would be subject to an entirely separate intervening process, and that's why it does not... Yeah, but if he succeeds on his claim that the forum in which his conviction was determined was unfair and deprived him of due process, you know, if he prevailed on that claim, wouldn't that entail to require the vicator of his conviction, or it would suggest the conviction was illegitimate? No, Your Honor, and that's true because it's a subject of the first 28-J letter that was filed in the case Arruano, which was interpreting the Supreme Court's decision in to explain that this intervening step required would show that that is not heck barred, because it would require an entirely separate proceeding, which we don't know may or may not happen. So, that's why just simply allowing Mr. Walker... I mean, we don't know if he will or will not proceed or succeed on the claim that the forum was unfair, but if he does succeed, it would entail... it would cast doubt on the legitimacy of his conviction, right? No, because the heck bar requires that the proceeding would necessarily invalidate the underlying conviction, and that... But he's arguing that the forum in which he was convicted of the crime was unconstitutional as a violation of due process, right? That's the claim. So, if that's true, why would that not require the invalidation of the conviction? Because there would be required an entirely separate hearing that would need to occur, and at that hearing, if he prevailed, then that second step is... Oh, so you're saying all we want is a fair forum. That's it. And so, if we have a fair forum, he might be convicted again. Yeah. But so, that means you agree it applies the invalidity of the conviction he has now, but he might get another conviction in the future. That's what your argument is. Your Honor, our argument is just that allowing Mr. Walker to raise his claim is not heck barred, because at most, it gives him a chance to bring his claim. Okay. Thank you. If there's no further questions, we ask this court to reverse the decision below and remand for further proceedings. Thank you. And thank you both. We'll take the matter under advisement.